## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAWA, INC.,<br><br>               Plaintiff,<br><br>v.<br><br>MASTERCARD INTERNATIONAL, INC.,<br><br>               Defendant. | **COMPLAINT**<br><br>Case No.: 22-cv-3186 |

Wawa, Inc. ("Wawa" or "Plaintiff"), by and through its undersigned attorneys, brings this Complaint against Mastercard International, Inc., ("Mastercard" or "Defendant") and alleges the following:

### NATURE OF THE ACTION

1.      Wawa brings this Complaint against Defendant Mastercard to recover $10,731,212.14 wrongfully taken by Mastercard.  Specifically, based on a data security incident suffered by Wawa, Mastercard wrongfully imposed a $10,731,212.14 purported incident-related penalty (the "ADC Liability Assessment") on Bank of America N.A. ("BANA"), Wawa's bank, in violation of Mastercard's agreement with BANA and applicable legal principles governing that contract.  Mastercard then collected the ADC Liability Assessment from BANA.  BANA in turn sought reimbursement for the ADC Liability Assessment from Wawa pursuant to the indemnity provision in its contract with Wawa.  Wawa objected to BANA's indemnity claim.  BANA and Wawa ultimately resolved that objection by Wawa's agreeing to reimburse BANA for the ADC Liability Assessment, in exchange for BANA's agreeing to assign to Wawa, and to subrogate Wawa to, BANA's claims to recover from Mastercard the amount of the ADC Liability

[1]

Assessment and any other amounts incurred by BANA as a result of Mastercard's unlawful conduct in imposing and collecting the ADC Liability Assessment.

2.     By this Complaint Wawa therefore seeks, as BANA's assignee and/or subrogee, or alternatively directly in its own right, to recover from Mastercard the amount of the ADC Liability Assessment.   Wawa also seeks to recover, as BANA's assignee, or alternatively as BANA's subrogee and/or directly in its own right to the extent Wawa paid such amounts, any other amounts incurred by BANA as a result of Mastercard's unlawful conduct in imposing and collecting the ADC Liability Assessment.   Wawa also seeks to recover, directly in its own right, any other amounts incurred and paid by Wawa as a result of Mastercard's wrongful conduct in imposing and collecting the ADC Liability Assessment.

3.     Wawa is entitled to the recoveries that it seeks by this Complaint because BANA had no liability to Mastercard for the ADC Liability Assessment.   BANA had no such liability because the ADC Liability Assessment was *unlawful* and *invalid*.   As a result of such unlawfulness and invalidity, by imposing and collecting the ADC Liability Assessment, Mastercard breached its contract with BANA, separately breached that contract's implied covenant of good faith and fair dealing, became liable for the ADC Liability Assessment under the doctrine of money had and received / unjust enrichment, and violated N.Y. GBL § 349 and N.C. § 75-1.1.

4.     The ADC Liability Assessment was *unlawful* because, whether characterized as liquidated damages or as a payment obligation owed by BANA under its contract with Mastercard, the contract provisions that purportedly authorized the ADC Liability Assessment do not meet applicable legal requirements for valid contractual provisions and, accordingly, are unenforceable penalty provisions.

5.     Even if the ADC Liability Assessment was lawful, the ADC Liability Assessment is, in any event, *invalid* because, in determining and calculating the ADC Liability Assessment, Mastercard failed to comply with its own rules governing such determinations and calculations, which rules are incorporated into BANA's contract with Mastercard.

## PARTIES

6.     Plaintiff Wawa is a New Jersey corporation with its principal place of business in Wawa, Pennsylvania.

7.     Defendant Mastercard is a Delaware corporation doing business as Mastercard Worldwide and is the principal operating subsidiary of Mastercard Incorporated, a Delaware stock corporation.  Mastercard's principal place of business is in Purchase, New York.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interests and costs, and there is complete diversity of citizenship between the parties.

9.     This Court has personal jurisdiction over Defendant Mastercard, and venue is appropriate in this District, including pursuant to 28 U.S.C. § 1391(b), because Mastercard does business in New York and a substantial part of the events giving rise to Wawa's claims occurred in this District and/or because a provision in the contracts governing portions of this dispute provide for the exclusive venue in this District.

## FACTUAL ALLEGATIONS

*The Mastercard Payment Network*

10.     Mastercard operates a payment card network.  Financial institutions (referred to by Mastercard as "Customers") contract with Mastercard for the authority to offer consumers and

[3]

merchants access to Mastercard's network.  An "Issuer" Customer financial institution gives consumers access to the Mastercard network by issuing Mastercard-branded payment cards to "cardholders."  An "Acquirer" Customer financial institution, usually in partnership with a service provider called a "Processor", gives merchants access to the Mastercard network by authorizing them to accept Mastercard-branded payment cards in payment for transactions.

11.     Each agreement between Mastercard and a Customer incorporates the Mastercard *Standards*.  The *Standards* are embodied in various manuals issued by Mastercard, including, *inter alia*, the *Mastercard Rules*, the *Mastercard Security Rules and Procedures* (the "*Security Rules*"), the *Account Data Compromise User Guide* ("*ADC User Guide*"), and the *Chargeback Guide.*

12.     There is a funds flow within the Mastercard network to settle transactions.  As to any transaction made with a Mastercard-branded payment card, the Acquirer/Processor in question pays the merchant in question the dollar amount of the transaction, minus applicable fees (including a per-transaction "interchange fee") charged by the Acquirer/Processor, Mastercard, and the Issuer.  The Acquirer/Processor in turn collects the transaction amount from Mastercard (this time, minus only Mastercard's and the Issuer's fees).  Mastercard in turn collects the transaction amount back from the relevant Mastercard Issuer (minus only the Issuer's fees).  The Issuer then collects the transaction amount back from the Mastercard cardholder who made the transaction in question.  A diagram of this funds flow within the Mastercard network is attached as Exhibit 1.

13.     There are over 2.5 billion Mastercard-branded payment cards in use worldwide, which are accepted at tens of millions of merchant locations.  The Mastercard network transacted over $7 trillion in 2021, resulting in over $18 billion in revenue for Mastercard.

*The Payment Card Industry Data Security Standards ("PCI DSS")*

14. The *Standards* require all Acquirers to cause their merchants to contractually commit to comply with the Payment Card Industry Data Security Standards ("PCI DSS"). The PCI DSS is a set of data security requirements developed by the payment brands (including Mastercard) through the Payment Card Industry Security Standards Council, an organization founded by the major payment brands (including Mastercard).

15. The PCI DSS includes twelve overarching security requirements, each of which is split into numerous security sub-requirements, for a total of over 200 security sub-requirements. The purported intent of the PCI DSS, according to the payment brands, is to protect from theft payment card account data (such as account number, expiration date, and verification codes embedded in a payment card's magnetic stripe or chip and printed on the back of the card).

16. The PCI DSS requirements and sub-requirements apply to all "system components" of any entity that is subject to the PCI DSS. "System components" are defined as any network component, server, or application that is included in or connected to the "cardholder data environment." The cardholder data environment is comprised of people, processes, and technology that store, process, or transmit cardholder data or sensitive authentication data on behalf of an entity. Other portions of a merchant's computer network are not system components and thus are not subject to the PCI DSS. An entity thus may reduce the scope of its PCI DSS compliance obligation by segmenting its network to limit the "system components" within the entity's network that are included in or connected to the entity's "cardholder data environment" and that, accordingly, are subject to the PCI DSS.

***Mastercard's Account Data Compromise Program ("ADC Program")***

17.     In the event an Acquirer's merchant suffers a data security incident involving its cardholder data environment, the *Standards* purport to establish requirements for (1) investigating the incident on behalf of Mastercard and (2) assessing liability on the merchant's Acquirer for losses allegedly suffered by Issuers resulting from that data security incident.

18.     With respect to the investigation, the *Standards* require an Acquirer to immediately notify Mastercard of certain data security incidents or potential data security incidents identified at one of the Acquirer's merchants.

19.     If requested by Mastercard, the *Standards* require the Acquirer to retain, or to cause its merchant to retain, a forensic investigator (often referred to as a "Payment Card Industry Forensic Investigator" or "PFI") to conduct Mastercard's investigation of the incident and report its findings to Mastercard.  The PFI must be selected from a short list of investigators that have been pre-approved by Mastercard and the other payment brands through the Payment Card Industry Forensic Investigator Program.

20.     The PFI then must strictly comply with the guidelines established by the payment brands, including Mastercard, regarding how the investigation is conducted.

21.     The PFI must report its findings to Mastercard in a manner containing particular information and on a particular form specified by Mastercard and the other payment brands, and the investigation cannot conclude until Mastercard is satisfied with its completeness.

22.     The *Standards* also include a purported "contractual mechanism" (the "ADC Program") for, once Mastercard's investigation is complete, (a) determining whether the data security incident is eligible for an "issuer reimbursement assessment" under the ADC Program; (b) if so, determining the amount of any such assessment; and (c) collecting the assessment amount

from the Acquirer in question and distributing funds from the assessment amount to the Mastercard Issuers in question, allegedly in reimbursement for fraud losses and operating expenses that those Issuers may or may not have incurred as a result of the data security incident.

23.     Under the *Security Rules*, not every data security incident involving a merchant's cardholder data environment is eligible for an issuer reimbursement assessment under the ADC Program.  As relevant here, only particular Mastercard accounts meeting certain specified criteria qualify for such an assessment.  Specifically, under the *Standards*, in order for any individual Mastercard account to qualify for liability under the ADC Program ("ADC Liability") as to any given data security incident:

- *First*, the account must have suffered an "ADC Event" by reason of the incident, meaning the incident must have resulted in an actual theft of the account number (and, for ADC Fraud Recovery as defined below, of the full contents of any track on the card's magnetic stripe);

- *Second*, the Acquirer must be "responsible" for the ADC Event, meaning there must have been a violation of the PCI DSS that caused the ADC Event;

- *Third*, at least 29,999 other Mastercard accounts must have each met both of the above ADC Liability qualification requirements;

24.     For those Mastercard accounts that meet these criteria as to any given data security incident (the "Qualified Accounts"), an Acquirer's potential ADC Liability to Mastercard as to that incident with respect to the Qualified Accounts includes, as to each such account, two potential purported components: Account Data Compromise Fraud Recovery ("ADC Fraud Recovery") and Account Data Compromise Operational Reimbursement ("ADC Operational Reimbursement").

25.     ADC Fraud Recovery is purported contractual liability to Mastercard for fraud losses allegedly incurred by Issuers with respect to the Qualified Accounts as a result of the data security incident in question.

26.     ADC Operational Reimbursement is purported contractual liability to Mastercard for operating expenses allegedly incurred by Issuers with respect to the Qualified Accounts as a result of the data security incident in question.

27.     Under the *Standards*, (a) ADC Fraud Recovery as to any given Issuer must reflect the actual fraud losses incurred by that Issuer with respect to its Qualified Accounts as a result of the data security incident in question, and (b) ADC Operational Reimbursement as to any given Issuer must reflect the actual operating expenses incurred by that Issuer with respect to its Qualified Accounts as a result of the data security incident in question.

28.     Mastercard regularly asserts claims for ADC Liability against Acquirers.

### The Relationship Among the Parties

29.     BANA has contracted with Mastercard to be both an Issuer and Acquirer Customer of the Mastercard network by way of a contract that incorporates the *Standards.*

30.     Wawa, in order to accept Mastercard-branded payment cards in payment for transactions at its establishments, on or about September 26, 2007, entered into a Merchant Agreement (the "Merchant Agreement") with BANA, as Acquirer, and Banc of America Merchant Services, LLC ("BAMS") as Processor.  On or about June 5, 2020, BAMS assigned its rights and obligations as Processor under the Merchant Agreement to BANA.

31.     Section 13 of the Merchant Agreement states that Wawa "shall promptly pay [BANA] for all expenses, claims, assessments, fines, losses, costs, penalties, and Issuer reimbursements imposed by the Card Organizations against [BANA]" that relate to the "loss,

disclosure, theft, or compromise of Cardholder data or Card transaction information that is submitted to [BANA] by [Wawa] pursuant to [the Merchant Agreement]."

***The Incident***

32.     On or about December 7, 2019, Wawa discovered that a data security incident resulted in unauthorized access to Wawa's cardholder data environment (the "Incident").  On December 10, 2019, Wawa discovered malware installed on its computer network.  This malware was designed to access payment card information used at Wawa's stores and "pay at the pump" automated fuel dispensers (or "Automated Fuel Dispensers" or "AFDs").

33.     Wawa informed BANA of the Incident on December 8, 2019.  BANA, in turn, notified all payment brands, including by notifying Mastercard that same day.

34.     As required, Wawa engaged SecurityMetrics as the PFI to conduct an investigation of the Incident on behalf of the payment brands, including Mastercard.  The investigation was then conducted in accordance with the specifications established by the payment brands, including Mastercard.

35.     The PFI issued several interim "Final Reports" to the payment brands, including Mastercard, starting in October of 2020.  At the insistence of the payment brands, including Mastercard, the PFI made multiple changes and revisions to these "final" reports.

36.     On January 12, 2021, the PFI issued its final "final" PFI Report regarding its investigation (the "Revised PFI Report").

37.     Wawa also promptly notified the FBI of the Incident.

38.     At the time of the Incident, payment card transactions were (and still are) initiated in one of two ways at merchant locations nationwide, either by means of the cardholder's payment

card being "swiped" at the point of sale (a "mag-stripe-swipe transaction") or by means of EMV chip technology.

39.     Although EMV chip technology is generally considered the more secure means by which to initiate a payment card transaction, a myriad of industry-wide factors impeded and rendered impossible the implementation of EMV technology by fuel retailers across the country as a point-of-sale option at AFDs during the period prior to the Incident.  Quite simply, AFD manufacturers, software providers, support services, and card brands did not have the hardware, software, services, or technical ability to implement AFD EMV technology, and the implementation faced regulatory hurdles.  These impediments have been identified and acknowledged by the payment brands, including Mastercard.  Although Wawa began implementation of EMV technology at its AFDs in 2016, all of its AFDs did not have EMV technology until March 2020, making Wawa the first fuel retailer to provide a company-wide EMV technology point-of-sale option at its AFDs utilizing the hardware and software present at Wawa's fuel store locations.

40.     The malware involved in the Incident attempted to take advantage of the PCI DSS security protocols concerning "mag-stripe-swipe transactions."   During the transaction authorization process for a mag-stripe-swipe transaction, certain payment card account data embedded in the payment card's magnetic stripe (including the Primary Account Number ("PAN"), the card's expiration date, and—most importantly—the card's Card Verification Value, or "CVV") is electronically transmitted from the merchant to its Acquirer, and then from the Acquirer to the payment brand (e.g., Mastercard), and then from the payment brand to the Issuer, so that the Issuer can determine whether or not to approve the transaction.

41.     At different times during the Incident, malware designed to capture account data from payment cards used to make mag-stripe-swipe transactions was installed on Wawa's computer systems.   Specifically, this malware was designed to capture such data in the milliseconds during which it was in the electronic memory of Wawa's systems so that the data could be transmitted to BANA from the Wawa location in question, after the cards were swiped at that location to pay for the cardholder's purchase.   However, the PFI did not identify evidence of transmission of any such captured data outside of Wawa's network.

42.     Based in part on information provided to it by the PFI, Mastercard issued alerts to its Issuers with respect to at least 5,076,322 unique accounts (collectively, the "Alerted-On Accounts"), even though there was no forensic evidence that data relative to any of the Alerted-On Accounts had actually been stolen during the Incident.

***The ADC Liability Assessment***

43.     On or about August 30, 2021, Mastercard provided to BANA an Acquirer Financial Responsibility Report (the "Final Liability Report").   In the Final Liability Report, Mastercard reported that it had purported to determine that 5,076,322 of the Alerted-On Accounts qualified for ADC Liability (the "Assessed Accounts") and that, under the ADC Program, Mastercard was assessing BANA $17,885,353.56 in ADC Operational Reimbursement ("Preliminary ADC Liability Assessment").   Mastercard did not assess BANA for any fraud losses pursuant to the ADC Fraud Recovery portions of the ADC Program.

44.     On or about November 1, 2021, BANA provided Mastercard an appeal that set forth the reasons why the Preliminary ADC Liability Assessment was invalid and unlawful, and that alternatively requested that Mastercard exercise its discretion to reduce the amount of the Preliminary ADC Liability Assessment.

45.     On or about November 30, 2021, Mastercard provided BANA with a response to the appeal.  In that response, Mastercard denied that the Preliminary ADC Liability Assessment was either invalid or unlawful, although Mastercard's response identified that the appeal contained legal arguments that Mastercard declined to address.  Mastercard further stated that it had elected to exercise its discretion to reduce the amount of the Preliminary ADC Liability Assessment pursuant to Section 10.2.5.2 of the Security Rules by $7,154,141.42, or just shy of 40%, to $10,731,212.14, which amount thereby became the ADC Liability Assessment.

46.     BANA asserted that it was entitled to indemnification and reimbursement from Wawa for any assessment related to the Incident, including the ADC Liability Assessment, pursuant to the Merchant Agreement and proposed debiting the amount of the ADC Liability Assessment from amounts otherwise due to Wawa.  Wawa disputed that BANA had any right to indemnification and reimbursement of the ADC Liability Assessment and objected to any debiting of the ADC Liability Assessment from Wawa because the ADC Liability Assessment did not constitute a loss to BANA because Mastercard collected the ADC Liability Assessment without a contractual or lawful basis.

47.     Effective December 14, 2021, Wawa and BANA entered into the "BANA Assignment Agreement" (the "Assignment Agreement"), the purpose of which was to "preserve and allow Wawa the ability to contest [the ADC Liability Assessment] solely against Mastercard."

48.     Accordingly, under the BANA Assignment Agreement, BANA and Wawa agreed that, despite that Wawa's having disputed BANA's indemnity claim in regard to the ADC Liability Assessment, BANA would, over Wawa's objection, debit the full amount of the ADC Liability Assessment of $10,731,212.14 from Wawa's deposit account with BANA in satisfaction of Wawa's purported reimbursement obligation under the Merchant Agreement and, in exchange,

would "assign[], subrogate[], and transfer[] to Wawa or its assigns all rights and claims it may have against Master[C]ard related to the [ADC Liability Assessment] or otherwise related in any way to the In[trusion]."

49.     On December 17, 2021, pursuant to the BANA Assignment Agreement, BANA debited the amount of the ADC Liability Assessment from funds otherwise owed to Wawa.

50.     On December 19, 2021, Mastercard collected the amount of the ADC Liability Assessment from BANA's account by debiting that amount from amounts otherwise owed to BANA by Mastercard.

***The ADC Liability Assessment Is Invalid Because There Is No Basis for Concluding that an ADC Event Occurred as to Any, Let Alone All, of the Assessed Accounts***

51.     Under the *Standards*, Mastercard may only invoke the ADC Program for an individual Mastercard account if such account suffers an ADC Event during the incident in question, meaning the actual theft of payment card account data.

52.     There was no forensic evidence showing, and in any event it was not the case, that data with respect to all of the Assessed Accounts or even with respect to any particular Assessed Account was stolen during the Incident.  In particular, the Revised PFI Report, which was the sole basis for Mastercard's qualification of the Assessed Accounts for the ADC Liability, makes no finding that, and provides no forensic information to support a finding that, data relative to any particular Assessed Account (let alone all of them) was stolen during the Incident.

53.     Accordingly, no sufficient basis existed or exists for concluding that any particular Assessed Account (let alone all of them) suffered an ADC Event during the Incident.

54.     The ADC Liability thus violated the *Standards* because none of the Assessed Accounts suffered an ADC Event during the Incident, with the result being that none of the

Assessed Accounts were properly qualifiable (or at a minimum not all of the Assessed Accounts were properly qualifiable) for ADC Liability by reason of the Incident.

### *The ADC Liability Assessment Is Invalid Because There Is No Basis to Conclude that BANA Was "[R]esponsible" for Any Alleged ADC Event that May Have Occurred During the Incident*

55.     Under the *Standards*, an account can only qualify for ADC Liability if the Acquirer in question is "responsible" for the ADC Event that occurred with respect to that account.  To be found "responsible" for an ADC Event, the alleged ADC Event must have resulted from a violation of the PCI DSS.

56.     Here, Mastercard did not find, and it was not in fact the case, that a violation of the PCI DSS occurred, or that such a violation caused an ADC Event to occur as to any of the Assessed Accounts (let alone all of the Assessed Accounts).  Because Mastercard did not find, and in any event no basis existed to support a finding, that a PCI DSS violation had caused an ADC Event to occur (and that thus BANA was responsible for an ADC Event's having occurred) with respect to each Assessed Account, none of the Assessed Accounts were properly qualified for ADC Liability.  Accordingly, for this reason alone, the ADC Liability Assessment violated the *Standards.*

57.     Moreover, even had Mastercard made such a finding and, based on such a finding, had determined that BANA was responsible for an ADC Event's allegedly having occurred with respect to each Assessed Account, Mastercard's decision to collect the ADC Liability Assessment would nevertheless have been in violation of the *Standards*.  Under the *Standards*, an Acquirer such as BANA must ensure that a merchant like Wawa complete every year a Report on Compliance ("ROC") prepared by a Qualified Security Assessor ("QSA") (or Internal Auditor if signed by an officer of the company) verifying that the merchant has validated compliance with the PCI DSS.  On October 31, 2019, Coalfire, Wawa's QSA, issued a ROC (the "2019 ROC") that found all applicable

requirements "in place."  Given the 2019 ROC, Mastercard had and has no basis for making conflicting findings as to Wawa's PCI DSS compliance.

58.     In any event, to the extent the Revised PFI Report concluded that the Incident was caused by a PCI DSS violation on the part of Wawa, the Revised PFI Report was in error because the configurations and controls identified by the Revised PFI Report as being violations of the PCI DSS did not in fact violate the PCI DSS.

59.     Moreover, to the extent the Revised PFI Report correctly concluded that the Incident was caused by a PCI DSS violation on the part of Wawa, as discussed above, the Revised PFI Report contains no forensic evidence showing, and in any event it was not the case, that data for all the Assessed Accounts (or even for any particular Assessed Account) were stolen as a result of any such violation.

60.     There accordingly is no basis for concluding and it was not in fact the case, as to any Assessed Account (much less all of the Assessed Accounts), that a violation of PCI DSS caused such Assessed Account to suffer an ADC Event.  Because no violation of PCI DSS occurred that caused any ADC Event, BANA was not responsible for an ADC Event's having occurred with respect to any Assessed Account by reason of the Incident.  As a result, none of the Assessed Accounts were properly qualified for ADC Liability by reason of the Incident.  For this independent and separate reason, the ADC Liability Assessment violated the *Standards.*

**The ADC Liability Assessment Is Invalid Because There Is No Basis for Concluding and It Is Not in Fact the Case that at Least 30,000 of the Assessed Accounts, Much Less All the Assessed Accounts, Qualify for ADC Liability in Connection with the Incident.**

61.     Under the *Standards*, even if a particular Mastercard account meets all the requirements to qualify for ADC Liability as to a particular data security incident, that account still does not qualify for ADC Liability as to that incident unless 29,999 other Mastercard accounts

[15]

each also meet all the qualification requirements as to that incident, such that in the aggregate at least 30,000 Mastercard accounts each meet all of the requirements.

62.     Here, as shown above, there is no basis for concluding and it was not in fact the case that (i) *even one* of the Assessed Accounts suffered an ADC Event during the Incident (see Paragraphs 51-54 above); or (ii) BANA was "responsible" for such ADC Event (see Paragraphs 55-60 above).  There accordingly is no basis for concluding as to even one of the Assessed Accounts that it met *either* of the core requirements that the *Standards* impose in order to qualify the account for ADC Liability in connection with the Incident.

63.     Moreover, even if a particular Assessed Account met both the core requirements for ADC Liability qualification, under the *Standards* that account still could not be qualified for ADC Liability unless 29,999 other Assessed Accounts likewise met both of these qualification requirements.  Even if there were a basis for concluding as to *one* of the Assessed Accounts that it met both core requirements that the *Standards* impose in order to qualify an account for ADC Liability in connection with the Incident (which there is not as shown in Paragraphs 51-60 above), there no basis for concluding as to as many as *30,000* of the Assessed Accounts that every one of them met both of those requirements.  Accordingly, the ADC Liability Assessment violated the *Standards* even apart from the reasons discussed in Paragraphs 51-60 above.

64.     Moreover, under the *Standards*, *every* individual Qualified Account must individually meet all of these requirements in order for that account to be qualified for ADC liability. Thus, here, even if 30,000 of the Assessed Accounts met both core requirements for ADC Liability qualification (which is not the case), in order for the ADC Liability Assessment to be valid, all 5,076,322 of the Assessed Accounts must have met both of these qualification requirements.  As shown in Paragraphs 51-60 above, even if both core requirements for ADC Liability qualification

could be met as to a particular Assessed Account, they cannot be met as to all 5,076,322 of the Assessed Accounts.  For this reason, the ADC Liability Assessment violated the *Standards* even apart from the reasons discussed in Paragraphs 51-54 and Paragraphs 55-60 above.

***The ADC Liability Assessment Is Invalid Because It Is Not Based on Losses Actually Incurred by Mastercard or Its Issuers by Reason of the Incident***

65.    Under the *Standards*, ADC Operational Reimbursement must limit an Issuer to recovering its non-ordinary-course operating expenses caused by the ADC Event in question.  Here, the ADC Liability Assessment does not represent actual losses incurred by Issuers caused by the Incident.  As a result, for this further reason, Mastercard's calculation of the ADC Liability Assessment violated the *Standards.*

66.    Mastercard's calculation of each Issuer's ADC Operational Reimbursement as to its Assessed Accounts violated the *Standards*' explicit requirement that ADC Operational Reimbursement be based on the costs actually incurred by Issuers in reissuing and implementing non-ordinary course monitoring as a result of the Incident.

67.    In arriving at the amount of ADC Operational Reimbursement, Mastercard made no effort to determine whether any given Issuer's Incident-related ADC Operational Reimbursement represented non-ordinary course operating expenses that Issuer had actually incurred as to its Assessed Accounts as a result of the Incident.  Nor did Mastercard make any effort to determine whether, and if so to what extent, any Issuer had actually incurred any non-ordinary course operating expenses as to any, let alone all, of its Assessed Accounts as a result of the Incident.

68.    Rather, Mastercard calculated each Issuer's Incident-related ADC Operational Reimbursement through a two-step methodology.  First, Mastercard multiplied the Issuer's number of Assessed Accounts by fixed amounts determined by both the size of the Issuer and by which of

the Issuer's Assessed Accounts did and did not have an EMV-enabled or contact-less payment card, as shown in the following grid:

| Tier | Gross Dollar | Mag Stripe | Chip | Contactless | Combo |
|---|---|---|---|---|---|
| 1 | 0-200MM | $0 | $7.25 | $7.50 | $8.00 |
| 2 | 201MM-1B | $0 | $5.00 | $5.15 | $5.30 |
| 3 | >1B | $0 | $3.75 | $3.95 | $4.05 |

69.     Mastercard then reduced the amount it calculated as to each Issuer under step one by (i) eliminating from the calculation those of the Issuer's Assessed Accounts (and any associated operational reimbursement) that had been published in previous alerts and (ii) applying to the remaining amount a fixed deductible of 10% to ostensibly eliminate from the calculation those of the Issuer's Assessed Accounts (and any associated operational reimbursement) that were "expired accounts" (i.e., those of the Issuer's Assessed Accounts that either had already expired or were about to expire at the time they were included in Mastercard's Incident-related alerts and that as a result cannot have been the source of any Incident-caused operating expenses).  The resulting amount as to each Issuer became that Issuer's ADC Operational Reimbursement as to the Incident as reflected in the Preliminary ADC Liability Assessment, which amount was, after BANA's appeal, reduced by approximately 40% as to each Issuer in the ADC Liability Assessment.

70.     As can be seen from the above two-step process, Mastercard's methodology for calculating each Issuer's Incident-caused ADC Operational Reimbursement assumed (i) each Issuer incurred *some amount* of Incident-caused operating expenses as to each and every one of its Assessed Accounts that employed a chip, contactless, or combo payment card, had not been published in a prior alert, and was not an "expired account" (collectively as to any Issuer its "Eligible Assessed Accounts"); (ii) the per-account amount of those expenses was at least $3.75; (iii) the per-account amount of those minimum expenses was always higher than $3.75 in the case of those Eligible

Assessed Accounts issued by "Tier 1" and "Tier 2" Issuers; (iv) such per-account minimum expenses were always $5.00 for each Tier 2 Issuer and $7.25 for each Tier 1 Issuer as to each of its Eligible Assessed Accounts; and (v) for Issuers in the same tier, every Issuer incurred the exact same amount of per-card operating expenses as to each of its Eligible Assessed Accounts that employed a chip card, the exact same higher amount of per-card operating expenses as to each of its Eligible Assessed Accounts that employed a contactless card, and the exact same even higher amount of per-card operating expenses as to each of its Eligible Assessed Accounts that employed a combo card. Finally, Mastercard's methodology assumed (i) that every Issuer's Assessed Accounts that employed a chip, contactless, or combo payment card and had not been included in a prior alert (its "Pre-Deductible Assessed Accounts") would have included the exact same percentage of "expired accounts" and (ii) that the 10% fixed deductible employed by Mastercard's methodology accurately reflects the amount of that assumed uniform percentage.

71.    Mastercard offers no basis for any of these crucial assumptions.  Moreover, there are many reasons to doubt the validity of these assumptions.  Each Issuer makes its own individual decisions on what advance steps to take to protect itself against data security incidents when they occur and what further steps to take to respond to any given data security incident once it occurs. Those decisions vary dramatically from Issuer to Issuer.  Many Issuers take no action whatsoever in response to a data security incident and thus incur no incident-caused operating expenses.  Many other Issuers, having invested in advance in technologies to protect themselves against data security incidents when they occur, rely on those technologies once a data incident does occur and as a result incur minimal if any additive operating expenses associated with that data security incident.  Many Issuers adopt different responses to different data security incidents, depending on the nature of the data security incident in question and, as a result, incur different per-card operating expenses from

one data security incident to the next.  Issuers also do not have uniform policies regarding the expiration dates of the cards that they issue, and the time lag between when a data security incident occurs and when Mastercard issues an alert as to that event varies greatly from event to event.  As a result, it cannot reasonably be assumed for every Issuer as to every data security incident (as the Mastercard methodology assumes for every Issuer as to every data security incident) that its Qualified Accounts that employed a chip, contactless or combo payment card and had not been included in a prior alert (its "Pre-Deductible Qualified Accounts") will include the exact same percentage of "expired" accounts.  Finally, Mastercard offers no basis for its assumption that, in every data security incident, the percentage of each Issuer's Pre-Deductible Qualified Accounts that were "expired accounts" would not only be uniform for every single issuer, but would also be exactly 10% for every single Issuer.

72.     As a result, Mastercard violated the *Standards'* requirement that ADC Operational Reimbursement reflect actual costs by assuming that every Issuer incurred some amount of operating expenses as to each and every one of its Eligible Assessed Accounts; that such expenses were always no less than $3.75 per Eligible Assessed Account for every single Issuer; that such per-account expenses never vary for any given Issuer or as between Issuers based on the nature of the data security incident in question, or based on what steps in advance of the data security incident in question any given Issuer took to protect itself against data security incidents when they occur, or based on what further steps any given Issuer took to respond to the data security incident once it had occurred; that such minimum per-account expenses were always higher than $3.75 in Tier 1 or Tier 2 rather than Tier 3; that such per-account minimum expenses were always $5.00 for each Tier 2 Issuer and $7.25 for each Tier 1 Issuer as to each of its Eligible Assessed Accounts; that for Issuers in the same tier, every Issuer incurred the exact same amount of per-card operating expenses as to

each of its Eligible Assessed Accounts that employed a chip card, the exact same higher amount of per-card operating expenses as to each of its Eligible Assessed Accounts that employed a contactless card, and the exact same even higher amount of per-card operating expenses as to each of its Eligible Assessed Accounts that employed a combo card; that every Issuer's Pre-Deductible Assessed Accounts included the exact same percentage of "expired accounts"; and that the 10% fixed deductible employed by Mastercard's methodology accurately reflects the amount of that assumed uniform percentage.

73.     Here, even after taking into account the approximate 40% reduction in each Issuer's ADC Operational Reimbursement following BANA's appeal of the Preliminary ADC Liability Assessment, the unreasonable assumptions Mastercard employed in calculating the ADC Liability Assessment resulted in each Issuer's ADC Operational Reimbursement being a minimum of approximately $2.25 (i.e., $3.75 x .6) per Eligible Assessed Account.  In many cases, the Issuers' actual non-ordinary course operating expenses as to their Eligible Assessed Accounts were either zero or a small fraction of the $2.25 per-account minimum ADC Operational Reimbursement calculated by Mastercard through its unreasonable assumptions.  As a result, under Mastercard's calculation methodology, many Issuers' Incident-related ADC Operational Reimbursement far exceeded their actual non-ordinary course operating expenses as to their Eligible Assessed Accounts.  Accordingly, had Mastercard followed the *Standards* by determining each Issuer's actually incurred operating expenses associated with the Incident, the amount of the ADC Operational Reimbursement component of the ADC Liability Assessment would have been far less than what it was.

74.     Mastercard's calculation of each Issuer's Incident-related ADC Operational Reimbursement therefore violated the *Standards'* requirement that any Issuer's ADC Operational

Reimbursement not exceed the Issuer's actual non-ordinary course operating expenses associated with the Incident.

***The ADC Liability Assessment Is Invalid Because Mastercard Cannot Impose ADC Operational Reimbursement Because Wawa Satisfied Requirements for Implementation of EMV-capable Terminals***

75.     Under the *Standards*, even if all of the qualification requirements for an incident have been satisfied as to each Mastercard account, Mastercard cannot impose an issuer reimbursement assessment pursuant to the ADC Program if the affected merchant satisfied certain thresholds for implementation of EMV-capable terminals.  Section 10.6.4.4 of the *Security Rules* states that Mastercard may not assess ADC Liability if "at least ninety-five (95%) of the Merchant's annual total Transaction count was acquired through Hybrid POS Terminals; and (ii) at least ninety-five percent of the Transactions deemed by Mastercard to be within scope of the ADC Event were acquired through Hybrid POS Terminals" and the Merchant had not experienced another ADC Event within the twelve months prior to the earliest alert issued for the Incident and was not storing Sensitive Authentication Data.

76.     Wawa did not experience a different ADC event during the year prior to the date of the earliest ADC alert issued by Mastercard in connection with the Incident and Wawa was not storing Sensitive Authentication Data.

77.     In 2016, well before the Incident, Wawa began replacing its point-of-sale devices with Hybrid POS Terminals (as defined in the *Standards*).[1]  In 2018, Wawa had completed installation of EMV payment terminals for all of its in-store transactions.  With respect to AFDs, however, although Wawa had worked to implement EMV technology on the same timeline, due to circumstances beyond Wawa's control, EMV software and hardware necessary to install EMV

---

[1] Under the *Standards*, a Hybrid Point-of-Sale ("POS") Terminals are those that are capable of processing both contact chip transactions and magnetic stripe transactions and have the configuration required for EMV processing.

was not available to Wawa until late 2019 (at which point Wawa immediately began implementation, which was completed in March 2020).

78.     Accordingly, because Mastercard and the other card brands recognized the impracticability of implementing EMV technology at AFDs, any transactions conducted at Wawa's AFDs should not have been included for purposes of determining whether Wawa met the threshold specified in Section 10.6.4.4 of the *Security Rules*.  With the AFD transactions excluded, at least ninety-five percent of all of Wawa's Mastercard transactions and at least ninety-five percent of the transactions Mastercard deemed to be in scope for the ADC Event were processed through Hybrid POS Terminals.

79.     For this reason as well, Mastercard's imposition of the ADC Liability Assessment thus violated the *Standards*.

80.     To the extent that the *Standards* permitted Mastercard to impose the ADC Liability Assessment notwithstanding the impracticability of Wawa to have achieved the ninety-five percent threshold, it was an abuse of discretion for Mastercard to have imposed the ADC Liability Assessment.

***The ADC Liability Assessment Is Unenforceable as a Matter of Law***

81.     In any event, the ADC Liability Assessment would be legally unenforceable even if it were valid under the *Standards*.  As an initial matter, under the *Standards*, Mastercard purports to reserve total unfettered discretion unto itself in determining whether to assess ADC Liability in the context of any given data security incident, in calculating the amount of any ADC Liability it does decide to assess, and in deciding whether or not to collect any assessment of ADC Liability from the Acquirer in question.  Because there is, as a result, no mutuality of obligation between Mastercard, on the one hand, and the relevant Acquirer, on the other, as to the *Standards* that purport to permit

assessments of ADC Liability, those provisions are not supported by consideration and are, therefore, unenforceable as illusory promises.

82.     Moreover, the ADC Liability Assessment is also unenforceable because it constitutes an unlawful penalty.

83.     The ADC Liability Assessment does not represent the actual damages of *Mastercard itself* by reason of the Incident.  To the contrary, by the *Standards'* very terms, the ADC Liability Assessment purports to constitute losses that *Issuers* allegedly incurred by reason of the Incident.

84.     Nor do the *Standards'* provisions for ADC Liability assessments purport to calculate the losses that Issuers *actually incur* by reason of the data security incident in question; instead, these provisions purport to *estimate* the Issuers' losses by means of formulas and algorithms that are predicated on generalized assumptions rather than the specific events of the data security event in question.  As a result, any liability arising under those provisions could only be sustained if the provisions were valid liquidated damages provisions and otherwise comported with public policy requirements for contracts.

85.     The *Standards'* provisions pursuant to which the ADC Liability Assessment was calculated and collected do not satisfy these requirements, however, for four separate and independently sufficient reasons:  (1) ADC Liability assessments are not intended to provide compensation for losses incurred by a party to or a third-party beneficiary of the contract between BANA and Mastercard; (2) the *Standards* purport to afford Mastercard unbounded discretion to determine how to calculate and whether to collect the amount of ADC Liability; (3) the amount of any losses that Mastercard and/or its Issuers may actually incur by reason of a data security incident is not only reasonably calculable, but calculable to the penny, to the extent they incurred any such

losses at all; and (4) ADC Liability is not Mastercard's exclusive remedy by reason of a data security incident.  Because the ADC Liability Assessment cannot be sustained as a valid award of either actual or liquidated damages by reason of an alleged BANA breach of its contractual obligation to Mastercard or otherwise satisfy applicable law for contractual provisions, it necessarily constitutes a penalty and, as such, is unenforceable under applicable law regardless of whether it comports with the *Standards* (which it does not).

## CAUSES OF ACTION

### First Cause of Action – Breach of Contract as to Amount of the ADC Liability Assessment
**(As Assignee and Subrogee of BANA)**

86.    Wawa repeats and incorporates by reference each and every allegation set forth herein.

87.    A valid contract exists between BANA and Mastercard under which Mastercard was, and is, bound to comply with the *Standards.*

88.    BANA has fully performed its obligations under its contract with Mastercard.

89.    Any conditions precedent to Mastercard's performance under its contract with BANA have occurred.

90.    Mastercard was contractually obligated under the *Standards* to calculate the ADC Liability Assessment in compliance with the *Standards* and applicable law.

91.    Only if the ADC Liability Assessment were both authorized by the *Standards* and enforceable under applicable law would Mastercard have been authorized to collect the ADC Liability Assessment from BANA.

92.    The ADC Liability Assessment was not authorized by the *Standards.*

93.    The ADC Liability Assessment, even if it were authorized by the *Standards* (it was not), is unenforceable under applicable law because it constitutes a contractual penalty.

94.     By collecting the ADC Liability Assessment from BANA, Mastercard breached its contractual obligation to comply with the *Standards.*

95.     Mastercard was (and is) therefore liable to BANA for the amount of the ADC Liability Assessment.

96.     BANA responded to Mastercard's wrongful imposition and collection of the ADC Liability Assessment by withholding the amount of the ADC Liability Assessment from Wawa, despite Wawa's objection and even though such collection was unlawful on Mastercard's part. Therefore, the ADC Liability Assessment represents funds in the possession of Mastercard that rightfully belong to Wawa.

97.     BANA assigned to Wawa any and all rights and/or claims that BANA may have against Mastercard to obtain reimbursement of any portion of the ADC Liability Assessment.

98.     Because BANA withheld the amount of the ADC Liability Assessment from Wawa over Wawa's objection based on a claim that it was entitled to reimbursement pursuant to the Merchant Agreement, Wawa was not a volunteer.

99.     As a result of the BANA Agreement and in addition by reason of BANA's withholding from Wawa an amount primarily owed to BANA by Mastercard, Wawa has also become subrogated to BANA's right of recovery against Mastercard of the ADC Liability Assessment.

100.    Accordingly, as assignee of and subrogee to BANA's breach of contract claims against Mastercard, Wawa is entitled to damages in amounts to be determined at trial, but not less than the full amount of any portion of the ADC Liability Assessment.

**Second Cause of Action – Breach of Implied Covenant of Good Faith and Fair Dealing**
**(As Assignee and Subrogee of BANA)**

101.    Wawa repeats and incorporates by reference each and every allegation set forth herein.

102.    A valid contract exists between BANA and Mastercard under which Mastercard was, and is, bound to comply with the *Standards*.

103.    BANA has fully performed its obligations under its contract with Mastercard.

104.    Any conditions precedent to Mastercard's performance under its contract with BANA have occurred.

105.    Mastercard was contractually obligated under the *Standards* to calculate the ADC Liability Assessment in compliance with the *Standards* and applicable law.

106.    Only if the ADC Liability Assessment were both authorized by the *Standards* and enforceable under applicable law would Mastercard have been authorized to collect the ADC Liability Assessment from BANA.

107.    The ADC Liability Assessment was not authorized by the *Standards* or applicable law.

108.    The *Standards* purport to empower Mastercard with the right to unilaterally determine the rights of Mastercard and obligations of Mastercard Customers under certain aspects of the *Standards* including, without limitation, certain aspects relating to the collection and calculation of the amount of an ADC Liability assessment.  To the extent the *Standards* purport to grant Mastercard the unilateral discretion to determine the rights and obligations of Mastercard and BANA under the *Standards* regarding any aspect of Mastercard's calculation and/or collection of the ADC Liability Assessment, those provisions are unenforceable as a matter of law.  However, to the extent any of those provisions are found to be enforceable to any extent (which they are not),

Mastercard acted unfairly and without good faith by the manner in which it exercised such discretion in calculating the ADC Liability Assessment and collecting the ADC Liability Assessment from BANA, and by doing so deprived BANA of the benefits of its contract with Mastercard.  Thus, Mastercard violated the implied covenant of good faith and fair dealing.

109.    Mastercard was (and is) therefore liable to BANA for the amount of the ADC Liability Assessment.

110.    Mastercard, in equity and good conscience, should discharge that liability.  It is primarily answerable to BANA for the amounts of the ADC Liability Assessment.

111.    BANA responded to Mastercard's wrongful imposition and collection of the ADC Liability Assessment by withholding the amount of the ADC Liability Assessment from Wawa, despite Wawa's objection and even though such collection was unlawful on Mastercard's part. Therefore, the ADC Liability Assessment represents funds in the possession of Mastercard that rightfully belong to Wawa.

112.    BANA assigned to Wawa any and all rights and/or claims that BANA may have against Mastercard to obtain reimbursement of any portion of the ADC Liability Assessment.

113.    Because BANA withheld the amount of the ADC Liability Assessment from Wawa over Wawa's objection based on a claim that it was entitled to reimbursement pursuant to the Merchant Agreement, Wawa was not a volunteer.

114.    As a result of the BANA Agreement and in addition by reason of BANA's withholding from Wawa an amount primarily owed to BANA by Mastercard, Wawa has also become subrogated to BANA's right of recovery against Mastercard of the ADC Liability Assessment.

115. Accordingly, as assignee of and or subrogee to BANA's breach of the covenant of good faith and fair dealing claim against Mastercard, Wawa is entitled to damages in amounts to be determined at trial, but not less than the full amount of any portion of the ADC Liability Assessment together with any amounts incidental to the ADC Liability Assessment that Wawa has paid to BANA.

### Third Cause of Action – Money Had and Received / Restitution / Unjust Enrichment
#### (As Assignee and Subrogee of BANA)

116. Wawa repeats and incorporates by reference each and every allegation set forth herein.

117. By calculating the ADC Liability Assessment, and by collecting the ADC Liability Assessment from BANA without any contractual or lawful basis for so doing, Mastercard was unjustly enriched, and Mastercard received money meant to be used for the benefit of BANA

118. By calculating the ADC Liability Assessment, and by collecting the ADC Liability Assessment from BANA, BANA conferred, and Mastercard accepted, a benefit that was neither conferred officiously nor gratuitously.

119. By reason of Mastercard's wrongful collection of the ADC Liability Assessment, Mastercard possesses funds that ultimately and rightfully belong to BANA.

120. To allow Mastercard to retain such funds when Mastercard has no right to such funds would go against principles of right, justice, and morality.

121. BANA is accordingly owed the amounts wrongfully collected by Mastercard.

122. Mastercard also was unjustly enriched by its actions in wrongfully collecting the ADC Liability Assessment because these actions violated basic principles of fairness, equity, and good conscience, and require that Mastercard make restitution to BANA of the amounts by which Mastercard has been unjustly enriched at BANA's expense. Mastercard obtained this benefit

through fraud, duress, and the taking of undue advantage, by leveraging its position to unilaterally withhold funds that it knew or should have known it had no right to withhold, and by misrepresenting to BANA that it had the authority to do so.

123.   To allow Mastercard to retain such funds when Mastercard has no right to such funds would go against principles of right, justice, and morality.

124.   BANA is accordingly owed the amounts wrongfully collected by Mastercard.

125.   BANA responded to Mastercard's wrongful imposition and collection of the ADC Liability Assessment by withholding the amount of the ADC Liability Assessment from Wawa, despite Wawa's objection and even though such collection was unlawful on Mastercard's part. Therefore, the ADC Liability Assessment represents funds in the possession of Mastercard that rightfully belong to Wawa.

126.   BANA assigned to Wawa any and all rights and/or claims that BANA may have against Mastercard to obtain reimbursement of any portion of the ADC Liability Assessment.

127.   Because BANA withheld the amount of the ADC Liability Assessment from Wawa over Wawa's objection based on a claim that it was entitled to reimbursement pursuant to the Merchant Agreement, Wawa was not a volunteer.

128.   As a result of the BANA Agreement and in addition by reason of BANA's withholding from Wawa an amount primarily owed to BANA by Mastercard, Wawa has also become subrogated to BANA's right of recovery against Mastercard of the ADC Liability Assessment.

129.   Accordingly, as assignee of and subrogee to BANA's unjust enrichment claims against Mastercard, Wawa is entitled to reimbursement in amounts to be determined at trial, but

not less than the full amount of any portion of the ADC Liability Assessment together with any amounts incidental to the ADC Liability Assessment that Wawa has paid to BANA.

### Fourth Cause of Action – Deceptive Acts or Practices in Violation of N.Y. GBL § 349
(As Assignee and Subrogee of BANA)

130.    Wawa repeats and incorporates by reference each and every allegation set forth herein.

131.    Mastercard is prohibited from engaging in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" by New York General Business Law § 349 (the "New York General Business Law").

132.    To enable consumers to make purchases at merchants using Mastercard-branded payment cards and to enable merchants to accept Mastercard-branded payment methods from consumers, all Acquirers, including BANA, must be part of the Mastercard network and agree to the *Standards*.

133.    By calculating and collecting the ADC Liability Assessment, Mastercard deliberately harmed BANA.  Because the ADC Liability Assessment against BANA is invalid under the *Standards* and applicable law, Mastercard lacks justification for having caused such harm to BANA and acted unfairly in so doing.  Moreover, by calculating and collecting the ADC Liability Assessment without a lawful basis, Mastercard abused its unfettered discretion to determine whether to collect the amount of the ADC Liability Assessment and to calculate the amount of the ADC Liability Assessment, amounting to an inequitable assertion of power.  Accordingly, Mastercard's wrongful calculation and collection of the ADC Liability Assessment was an unfair business practice as to BANA in violation of the New York General Business Law.

134.    By calculating and collecting the ADC Liability Assessment without a lawful basis, Mastercard misrepresented to BANA that these amounts were due and that BANA owed payment

to Mastercard under the *Standards* and applicable law.  Because the ADC Liability Assessment is invalid under the *Standards* and applicable law, the collection of the ADC Liability Assessment was a deceptive business practice as to BANA in violation of the New York General Business Law.

136.    Mastercard wrongfully obtained money from BANA in the amount of $10,731,212.14 by engaging in deceptive and unfair business practices as described above.

136.    Mastercard's unlawful collection of the ADC Liability Assessment is consumer-oriented conduct.  The *Standards*, which purportedly authorized the ADC Liability Assessment, underlie Mastercard's entire payment card network, which affects billions of transactions and consumers, millions of merchants, and thousands of financial institutions, and facilitate Mastercard's abuse of its discretion to unilaterally determine the rights of these parties in the payment card network.  Mastercard also regularly collects assessments similar to the ADC Liability Assessment from Acquirers.

137.    BANA responded to Mastercard's wrongful imposition and collection of the ADC Liability Assessment by withholding the amount of the ADC Liability Assessment from Wawa, despite Wawa's objection and even though such collection was unlawful on Mastercard's part. Therefore, the ADC Liability Assessment represents funds in the possession of Mastercard that rightfully belong to Wawa.

138.    BANA assigned to Wawa any and all rights and/or claims that BANA may have against Mastercard to obtain reimbursement of any portion of the ADC Liability Assessment.

139.    Because BANA withheld the amount of the ADC Liability Assessment from Wawa over Wawa's objection based on a claim that it was entitled to reimbursement pursuant to the Merchant Agreement, Wawa was not a volunteer.

[32]

140.     As a result of the BANA Agreement and in addition by reason of BANA's withholding from Wawa an amount primarily owed to BANA by Mastercard, Wawa has also become subrogated to BANA's right of recovery against Mastercard of the ADC Liability Assessment.

141.     Accordingly, as assignee of and subrogee to BANA's New York General Business Law claims against Mastercard, Wawa is entitled to reimbursement in amounts to be determined at trial, but not less than the full amount of any portion of the ADC Liability Assessment together with any amounts incidental to the ADC Liability Assessment that Wawa has paid to BANA.

### Fifth Cause of Action – Violation of N.C. Gen. Stat. § 75-1.1
**(As Assignee and Subrogee of BANA)**

142.     Wawa repeats and incorporates by reference each and every allegation set forth herein.

143.     Mastercard is prohibited from engaging in "unfair or deceptive acts or practices in or affecting commerce" by North Carolina General Statutes § 75-1.1 ("North Carolina Unfair Trade Practices Act").  Upon information and belief, Mastercard contracted with BANA, a North Carolina entity, in order to enable BANA's participation in the Mastercard network; Mastercard directed its claim for the ADC Liability Assessment at issue in this Complaint to BANA in North Carolina; and Mastercard caused the actual collection of the ADC Liability Assessment at issue in this Complaint from BANA, which is located in North Carolina.

144.     To enable consumers to make purchases at merchants using Mastercard-branded payment cards and to enable merchants to accept Mastercard-branded payment methods from consumers, all Acquirers, including BANA, must be part of the Mastercard network and agree to the *Standards*.

145.    By calculating and collecting the ADC Liability Assessment, Mastercard deliberately harmed BANA.  Because the ADC Liability Assessment is invalid under the *Standards* and applicable law, Mastercard lacks justification for having caused such harm to BANA and acted unfairly in so doing.  Moreover, by calculating and collecting the ADC Liability Assessment without a lawful basis, Mastercard abused its unfettered discretion to determine whether to collect the ADC Liability Assessment and calculate the amount of the ADC Liability Assessment, amounting to an inequitable assertion of power.  Accordingly, Mastercard's wrongful calculation and collection of the ADC Liability Assessment was an unfair business practice as to BANA in violation of the North Carolina Unfair Trade Practices Act.

146.    By calculating and collecting the ADC Liability Assessment without a lawful basis, Mastercard misrepresented to BANA that these amounts were due and that BANA owed payment to Mastercard under the *Standards* and applicable law.  Because the ADC Liability Assessment is invalid under the *Standard* and applicable law, the collection of the ADC Liability Assessment was a deceptive business practice as to BANA in violation of the North Carolina Unfair Trade Practices Act.

147.    Mastercard's unlawful collection of the ADC Liability Assessment affects commerce.  The *Standards*, which purportedly authorized the ADC Liability Assessment, underlie Mastercard's entire payment card network, which affects billions of transactions and consumers, millions of merchants, and thousands of financial institutions, and facilitate Mastercard's abuse of its discretion to unilaterally determine the rights of these parties in the payment card network.  Mastercard also regularly collects assessments similar to the ADC Liability Assessment from Acquirers.

148.    Mastercard wrongfully obtained money from BANA in the amount of $10,731,21.14 by engaging in unfair and deceptive business practices as described above.

149.    BANA responded to Mastercard's wrongful imposition and collection of the ADC Liability Assessment by withholding the amount of the ADC Liability Assessment from Wawa, despite Wawa's objection and even though such collection was unlawful on Mastercard's part. Therefore, the ADC Liability Assessment represents funds in the possession of Mastercard that rightfully belong to Wawa.

150.    BANA assigned to Wawa any and all rights and/or claims that BANA may have against Mastercard to obtain reimbursement of any portion of the ADC Liability Assessment.

151.    Because BANA withheld the amount of the ADC Liability Assessment from Wawa over Wawa's objection based on a claim that it was entitled to reimbursement pursuant to the Merchant Agreement, Wawa was not a volunteer.

152.    As a result of the BANA Agreement and in addition by reason of BANA's withholding from Wawa an amount primarily owed to BANA by Mastercard, Wawa has also become subrogated to BANA's right of recovery against Mastercard of the ADC Liability Assessment.

153.    Accordingly, as assignee of and subrogee to BANA's North Carolina Unfair Trade Practices Act claims against Mastercard, Wawa is entitled to reimbursement in amounts to be determined at trial, but not less than the full amount of any portion of the ADC Liability Assessment together with any amounts incidental to the ADC Liability Assessment that Wawa has paid to BANA.

154.    Wawa is also entitled to treble damages under North Carolina General Statutes §75-16.

## Sixth Cause of Action – Money Had and Received / Restitution / Unjust Enrichment
### (Direct)

155.    Wawa repeats and incorporates by reference each and every allegation set forth herein.

156.    By calculating the ADC Liability Assessment, and by collecting the ADC Liability Assessment from BANA without any contractual or lawful basis for so doing, Mastercard was unjustly enriched and received money meant to be used for the benefit of BANA.

157.    By calculating the ADC Liability Assessment, and by collecting the ADC Liability Assessment from, BANA, BANA conferred, and Mastercard accepted, a benefit that was neither conferred officiously nor gratuitously.

158.    Mastercard also was unjustly enriched by its actions in wrongfully calculating and collecting the ADC Liability Assessment because these actions violated basic principles of fairness, equity, and good conscience, and require that Mastercard make restitution to the deprived party of the amounts by which Mastercard has been unjustly enriched at the deprived party's expense.  Mastercard obtained this benefit through fraud, duress, and the taking of undue advantage, by leveraging its position to unilaterally withhold funds that it knew or should have known it had no right to withhold, and by misrepresenting to BANA that it had the authority to do so.

159.    Mastercard regularly collects assessments similar to the ADC Liability Assessment from Acquirers and knows or has reason to know that such assessments are regularly passed on to merchants.

160.    Mastercard knew, or had reason to know, when it calculated the amount of the ADC Liability Assessment, and collected the amount of the ADC Liability Assessment from BANA, that these amounts would be withheld by BANA from Wawa in whole or in part and that Wawa

would in that event be the entity that would bear the economic consequences of Mastercard's unfair, unlawful, and/or fraudulent conduct.

161.   To allow Mastercard to retain such funds when Mastercard has no right to such funds would go against principles of right, justice, and morality.

162.   BANA responded to Mastercard's wrongful imposition and collection of the ADC Liability Assessment by withholding the amount of the ADC Liability Assessment from Wawa, despite Wawa's objection and even though such collection was unlawful on Mastercard's part. Therefore, the ADC Liability Assessment represents funds in the possession of Mastercard that rightfully belong to Wawa.

163.   Because BANA withheld the amount of the ADC Liability Assessment from Wawa over Wawa's objection based on a claim that it was entitled to reimbursement pursuant to the Merchant Agreement, Wawa was not a volunteer.

164.   As a result of the BANA Agreement and in addition by reason of BANA's withholding from Wawa an amount primarily owed to BANA by Mastercard, Wawa has also become subrogated to BANA's right of recovery against Mastercard of the ADC Liability Assessment.

165.   Wawa is therefore entitled, to recover from Mastercard an amount to be determined at trial, but not less than the full amount of any portion of the ADC Liability Assessment together with any amounts incidental to the ADC Liability Assessment that Wawa has paid to BANA.

**Seventh Cause of Action – Deceptive Acts or Practices in Violation of N.Y. GBL § 349**
**(Direct)**

166.   Wawa repeats and incorporates by reference each and every allegation set forth herein.

167.    Mastercard is prohibited from engaging in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" by New York General Business Law § 349.

168.    To enable consumers to make purchases using Mastercard-branded payment methods, merchants like Wawa contract with an Acquirer authorized by Mastercard to be able to accept Mastercard payment cards.

169.    By calculating and collecting the ADC Liability Assessment, Mastercard deliberately engaged in conduct that it had reason to expect would harm Wawa. Because the ADC Liability Assessment is invalid under the *Standards* and applicable law, Mastercard lacks justification for having caused such harm to Wawa and acted unfairly in so doing. Moreover, by calculating and collecting the ADC Liability Assessment without a lawful basis, Mastercard abused its unfettered discretion to determine whether to collect the amount of the ADC Liability Assessment and to calculate the amount of the ADC Liability Assessment, amounting to an inequitable assertion of power. Accordingly, Mastercard's wrongful calculation and collection of the ADC Liability Assessment was an unfair business practice as to Wawa in violation of the New York General Business Law.

170.    By calculating and collecting the ADC Liability Assessment, Mastercard misrepresented to BANA that these amounts were due and that BANA owed payment to Mastercard under the *Standards* and applicable law. In so doing, Mastercard knew, or had reason to know, when it made such misrepresentation, that the amount of the ADC Liability Assessment would be withheld by BANA from Wawa in whole or in part and that Wawa would be the entity that would bear the economic consequences of Mastercard's unlawful conduct. Because the ADC Liability Assessment is invalid under the *Standards* and applicable law, the ADC Liability

Assessment was a deceptive business practice as to Wawa in violation of the New York General Business Law.

171.    Mastercard regularly collects assessments similar to the ADC Liability Assessment from Acquirers and knows or has reason to know that such assessments are regularly passed on to merchants by the Acquirers from which Mastercard collect such assessments.  Mastercard knew, or had reason to know, when it calculated and collected the ADC Liability Assessment from BANA, that the amount of the ADC Liability Assessment would be withheld by BANA from Wawa in whole or in part and that Wawa would be the entity that would bear the economic consequences of Mastercard's unlawful conduct.

172.    Mastercard's unlawful collection of the ADC Liability Assessment is consumer-oriented conduct.  The *Standards*, which purportedly authorized the ADC Liability Assessment, underlie Mastercard's entire payment card network, which affects billions of transactions and consumers, millions of merchants, and thousands of financial institutions, and facilitate Mastercard's abuse of its discretion to unilaterally determine the rights of these parties in the payment card network.  Mastercard also regularly collects assessments similar to the ADC Liability Assessment from Acquirers.

173.    BANA responded to Mastercard's wrongful imposition and collection of the ADC Liability Assessment by withholding the amount of the ADC Liability Assessment from Wawa, despite Wawa's objection and even though such collection was unlawful on Mastercard's part. Therefore, the ADC Liability Assessment represents funds in the possession of Mastercard that rightfully belong to Wawa.

174.    BANA assigned to Wawa any and all rights and/or claims that BANA may have against Mastercard to obtain reimbursement of any portion of the ADC Liability Assessment.

175.     Because BANA withheld the amount of the ADC Liability Assessment from Wawa over Wawa's objection based on a claim that it was entitled to reimbursement pursuant to the Merchant Agreement, Wawa was not a volunteer.

176.     As a result of the BANA Agreement and in addition by reason of BANA's withholding from Wawa an amount primarily owed to BANA by Mastercard, Wawa has also become subrogated to BANA's right of recovery against Mastercard of the ADC Liability Assessment.

177.     Wawa is therefore entitled, to recover from Mastercard an amount to be determined at trial, but not less than the full amount of any portion of the ADC Liability Assessment together with any amounts incidental to the ADC Liability Assessment that Wawa has paid to BANA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Wawa respectfully requests the Court to enter judgment in its favor and against Defendant Mastercard on the causes of action of this Complaint as follows:

A.  On all Causes of Action, for damages in amounts to be determined at trial, but not less than the full amount of any portion of the ADC Liability Assessment;

B.  On Causes of Action 2-7, for any amounts incidental to the ADC Liability Assessment that Wawa has paid to BANA;

C.  On Causes of Action 1-4 and 6-7, for compounding interest on all damages at the New York statutory rate of nine percent per annum;

D.  On Cause of Action 5, for compounding interest on all damages at the North Carolina statutory rate of eight percent per annum;

E.  Attorneys' fees and costs to the fullest extent recoverable by law;

F.  On all Causes of Action, for its court costs; and

G.  For any such other and further relief as this Court deems just and proper.


Respectfully Submitted,


Dated:  April 18, 2022                              */s/ Douglas H. Meal*    


                                            Douglas H. Meal, NY State Bar No. 1870492
                                            Seth Harrington (*pro hac vice* motion
                                            forthcoming)
                                            ORRICK, HERRINGTON & SUTCLIFFE LLP
                                            222 Berkeley Street, Suite 2000
                                            Boston, Massachusetts 02116
                                            Telephone: (617) 880-1800
                                            Email: dmeal@orrick.com
                                            Email: sharrington@orrick.com

                                            *Counsel for Wawa, Inc.*